# IN RE LUTEN.

APPEAL AND ERROR; PATENTS; CLAIMS AND SPECIFICATIONS.

1. On an appeal by an applicant for a patent from a decision of the Commissioner of Patents rejecting nineteen of his twenty-five claims, this Court has no power to review the action of the Commissioner in granting the claims allowed, although doubtful of their patentability.

2. Where the Commissioner rejected nineteen of the twenty-five claims of an applicant for a patent for an improved method of constructing arched bridges, upon the ground that the applicant's invention was confined specifically to bridges of entire concrete construction, and that the nineteen claims, unlike the other six, were not so limited under his application; and it appeared that the applicant stated in his application that his invention related to bridges "which are made of concrete, or other suitable material," and in one of his specifications he indicated a course to be pursued if the construction was to be of concrete; and it also appeared that his method was equally applicable to brick or stone construction,—this court, while expressing doubt as to the patentability of any of the claims in view of references to the prior art, *reversed* the decision of the Commissioner, on the ground that his conclusion with respect of the six claims allowed warranted the allowance of the others.

No. 557.   Patent Appeals.  Submitted January 15, 1909.   Decided March 2, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting certain claims in an application for a patent.                                                  *Reversed.*

The COURT in the opinion stated the facts as follows:

Daniel B. Luten filed this application April 1, 1907, for a patent for new and useful improvements in bridges or arches of concrete or other analogous materials.   Beginning his de-

scription, he says: "This invention relates to girder bridges, and to arch bridges which are made of concrete or other suitable materials, and to methods of erecting the same, and has for its. general object to provide an improved structure of the class referred to which shall combine a maximum of strength and efficiency with increased economy of construction, compared with similar bridges at present in use. The improvements to which my invention is directed pertain more directly to the spandrels, copings, and railings of such bridges, and to methods of so erecting structures as will produce an efficient and satisfactory superstructure."

Twenty-five claims are made and embody the methods of construction. The claims read as follows:

"That improvement in the art of building an arch comprising first placing the footings with upper surface upwardly inclined away from the span, then laying a pavement between the footings, then erecting centers on the pavement, then erecting the arch of plastic material on the centers, then erecting part of the spandrel or superstructure approximately to the copings, then adding the earth filling, pavement, or other loading, then erecting the forms for railing, coping, or other spandrel, then permitting the arch to harden, then releasing the centering supports, then allowing the arch to settle, then completing the spandrel, coping, or railing, and subsequently removing the centering.

"2. That improvement in the art of building an arch or girder comprising placing the foundations of the arch or girder, then laying a pavement between the foundations, then erecting temporary supports on the pavement, then erecting the arch or girder on the temporary supports, then erecting part of the spandrel or superstructure, then loading the structure, then erecting forms for railing or coping, then releasing the temporary supports, then allowing the arch or girder to settle, then adding to the spandrel or superstructure, and subsequently removing the centering.

"3. That improvement in the art of building an arch or girder of hardening plastic comprising placing the foundations,

then laying a pavement between the foundations, then erecting temporary supports on the pavement, then erecting the arch or girder on the temporary supports, then erecting part of the spandrel or superstructure, then adding part of the fixed loading, then erecting railing falsework, then releasing the temporary supports allowing the arch or girder to settle, then adding to spandrel, railing, or superstructure, and subsequently removing the centering.

"4. That improvement in the art of building an arch or girder comprising placing foundations for temporary supports, erecting temporary supports upon the foundations, then erecting an arch or girder on the temporary supports, then erecting the lower part of the spandrel or superstructure, then adding fixed loading, then erecting railing falsework, then releasing the temporary supports to allow settlement, then adding to spandrel, railing, or superstructure, and subsequently removing the temporary supports.

"5. That improvement in the art of building an arch or girder of hardening plastic comprising laying foundations of plastic for temporary supports, erecting temporary supports upon the foundation, then erecting an arch or girder on the supports, then erecting part of the spandrel or superstructure on the arch or girder, then adding other fixed loading, then erecting falsework for coping or railing, then lowering the temporary supports, then adding spandrel, coping, or railing of plastic material, and subsequently removing all falsework.

"6. That improvement in the art of building an arch or girder comprising erecting centers, then erecting an arch or girder on the centers, then erecting part of the spandrel or superstructure, then adding other loading, then erecting falsework for coping or railing, then lowering the centers, then adding to spandrel, coping, or railing, and subsequently removing the centers and forms."

"8. That improvement in the art of building an arch or girder comprising erecting the arch or girder on temporary supports, together with part of the spandrel or superstructure, then adding to the load on the arch or girder, then erecting false-

work for railing or coping, then manipulating the temporary supports so as to subject the arch or girder to stress without permitting excessive distortion, then adding to spandrel, coping, or railing.

"9. That improvement in the art of building an arch or girder of hardening plastic comprising erecting the arch or girder on temporary supports, together with part of the spandrel or superstructure, then adding to the load on the arch or girder, then erecting forms for railing or coping, then manipulating the temporary supports so as to subject the arch or girder to stress without permitting excessive distortion, then adding plastic material for spandrel, coping, or railing.

"10. That improvement in the art of building an arch or girder comprising erecting the arch or girder on temporary supports, together with part of the spandrel or superstructure, then adding roadway filling, then erecting railing falsework, then lowering the temporary supports, and subsequently completing spandrel, coping, or railing.

"11. That improvement in the art of building an arch or girder of hardening plastic comprising erecting the arch or girder on centers together with part of the spandrel or superstructure, then building up the roadway, then erecting forms for coping or railing, then striking the centers, and subsequently completing the spandrel, coping, or railing with plastic material.

"12. That improvement in the art of building an arch or girder comprising erecting the arch or girder on temporary supports, then erecting part of the spandrel or superstructure, then adding other loading, then lowering the temporary supports, and subsequently adding coping or railing.

"13. That improvement in the art of building an arch or girder of hardening plastic comprising erecting the arch or girder on temporary supports, then adding part of the spandrel or superstructure, then increasing the loading, then lowering the temporary supports, and subsequently completing spandrel, coping, or railing.

"14. That improvement in the art of building an arch or

girder comprising erecting the arch or girder together with part of the spandrel or superstructure on centers, then lowering the centers, and subsequently adding coping or railing.

"15. That improvement in the art of building an arch or girder of hardening plastic comprising erecting the arch or girder and part of the spandrel or superstructure approximately to the coping, on temporary supports, then lowering the supports, and subsequently adding coping and railing.

"16. That improvement in the art of building an arch or girder of concrete comprising erecting the arch or girder together with part of the spandrel or superstructure, then manipulating the supports of the arch or girder to permit settlement, and subsequently completing the spandrel, coping, or railing.

"17. That improvement in the art of construction comprising erecting a supporting structure of concrete together with part of the supported superstructure integral therewith, then subjecting the supporting structure to its principal loading stresses, and subsequently completing the superstructure.

"18. That improvement in the art of building an arch or girder of concrete comprising erecting the arch or girder together with part of the integral superstructure supported thereby, and completing the superstructure after the arch or girder is subjected to its principal loading stresses.

"19. That improvement in the art of construction comprising erecting a supporting structure of concrete together with part of the supported superstructure integral therewith, then subjecting the supporting structure to stresses induced by diminution of external support, and subsequently completing the superstructure.

"20. That improvement in the art of building an arch or girder bridge of concrete comprising erecting the arch or girder together with part of the integral superstructure supported thereby, and completing the superstructure after the arch or girder is subjected to stresses induced by diminution of external support.

"21. That improvement in the art of building an arch or girder bridge of concrete comprising erecting the arch or girder,

then erecting part of the integral superstructure supported
thereby, then applying additional loading, and subsequently add-
ing to the superstructure after the arch or girder is subjected
to its principal internal stresses.

"22. That improvement in the art of building an arch or
girder bridge of concrete comprising erecting the arch or girder
together with part of its integral superstructure, then apply-
ing granular loading, and subsequently completing the super-
structure after the arch or girder is subjected to stress.

"23. That improvement in the art of building an arch or
girder bridge of concrete comprising erecting the arch or girder
together with part of its integral superstructure, then applying
the other loading, then erecting forms for completing of super-
structure, and subsequently placing the concrete for superstruc-
ture after the arch or girder is subjected to its principal stresses.

"24. That improvement in the art of building a concrete
bridge comprising erecting the bridge together with integral
loading, and subsequently completing the integral loading after
the bridge has assumed its principal stresses.

"25. That improvement in the art of building a concrete
bridge comprising laying a pavement, erecting centers upon
the pavement, then erecting the bridge and spandrel approxi-
mately to the coping, then adding earth loading, then creating
forms for coping and railing, then manipulating the centers to
cause the bridge to assume its principal stresses, then complet-
ing coping and railing, and subsequently removing centers and
forms."

Applicant states that the generally recognized method of
constructing arched bridges consists in erecting centerings, and
then erecting the arch ring, the spandrel walls, coping, railings,.
and filling complete before the removal of the centerings, so
that the practically finished structure, including the roadway
proper, is supported upon the centering or falsework until the
concrete or mortar has properly set. By this process, the entire
structure, upon the removal of the centering, is at once subject-
ed to all of its settlement stresses, from which cracks inevitably
result, with sagging of the coping and railing immediately
above the crown.

By applicant's method, piers or abutments are first erect-
ed. Centering is then erected between these, the arch ring is
produced, and the lower portions of the spandrels are erected
while the centering is still in place. The extension of the
spandrel walls upwardly is not definitely stated. The center-
ing is then withdrawn so that the arch is subjected to its set-
tlement stresses. The sagging at any point through this set-
tling may then be compensated before the coping is added, thus
enabling it to remain true.

The Primary Examiner rejected all of the claims made on
references to the following publications: Engineering News,
Vol. 50, p. 427 (description of the Big Muddy river bridge);
Idem. Vol. 28, p. 49 (description of Goir Noir bridge construc-
tion); Transaction of the American Society of Civil Engineers,
vol. 17, pp. 210, 212. He said: "It is a matter of common
knowledge among mechanics of the building trades that if su-
perstructure is begun upon a foundation that has not had time
to settle, the walls of the superstructure will be likely to crack.
This is, of course, because tensional stresses are set up in the
superstructure. This principle is all that is included in the
alleged 'method' disclosed in this application. The appli-
cation is a mere attempt to obtain a patent for the appli-
ccation of this principle to the building of a bridge, and it
is thought, even without references, that a valid patent could
not be issued therefor. It is the custom among engineers
when building a succession of arches to provide timber for
centering for only part of the arches when the exigencies of
the construction will allow, construct the arch rings for part
of the arches, remove the centers, and use the same timber for
other arches. This is shown in the reference to the building of
the Big Muddy river bridge. The railroad now building from
southern Florida to Key West is an example of the case where
many arches in succession are to be built, in some cases extend-
ing over 2 or 3 miles." The Primary Examiner attached no
importance to the suggestion that the application is limited to
concrete construction alone. He said: "It is not seen to make
the slightest difference, in contemplating a 'method,' of what

material the arch is made. The settlement of a brick arch after
the building of superstructure will introduce tensile strains
as will the settlement of a concrete arch. This is graphically
illustrated by the effect of this decentering, as described by
Major Medley, 1863." (This refers to one of the publications
cited).

The Examiners-in-Chief, to whom applicant appealed, took
a different view. They said: "None of the references cited
by the Examiner discloses the idea of erecting the footings,
the arch or girder and a part of the superstructure or span-
drel of a concrete bridge, allowing the parts to settle by loosen-
ing or releasing the falsework of the bridge so that the struc-
ture assumes the principal stresses, and then completing the
superstructure. The object of this method of construction is
to prevent the settlement stresses from cracking the superstruc-
ture of the completed bridge. *  *  *  The Examiner refers
to a number of publications as anticipating appellant's improve-
ment, but these citations, while revealing the idea of allowing
a bridge structure to settle under load before the spandrels are
added, do not describe the partial completion of the spandrels
of a concrete bridge, the subsequent settling of this partially
completed structure, and the final completion of the spandrels."
They, however, reversed the Examiner's decision as to the last
six claims only, twenty to twenty-five inclusive. Their view
was that the appellant's invention is confined specifically to
bridges of entire concrete construction, and that the first nine-
teen claims, not being so limited, were not allowable, under
the application. Some of those claims it will be observed, fail
to specify that any part of the structure is made of concrete or
plastic material, while others limit the plastic material con-
struction to certain parts only, of the bridge structure. . For this
reason they affirmed the denial of claims one to nineteen, in-
clusive.

The Commissioner approved the reasoning of the Examiners-
in-Chief, and affirmed their decision.

*Mr. Chester Bradford* and *Mr. Arthur M. Hood* for the ap-
pellant.

*Mr. Webster S. Ruckman* for the Commissioner of Patents.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

We must confess to being strongly impressed with the reason-- ing of the Primary Examiner on the general question of patent- ability, in view of the common knowledge of the art, and the descriptions of former bridge constructions contained in the sev- eral publications referred to by him. But we are of the opin- ion that consideration of that question is precluded by the de- cisions subsequent to his. The conclusion of the Examiner was denied, and as a consequence six of the claims denied by him have been allowed, and a patent containing them will be grant- ed, no matter what may be the result of this appeal, for we have no jurisdiction to review the decision as to them. We are constrained, therefore, to confine our consideration to the question whether the applicant is to be limited to claims based on an entire concrete construction, where a portion of the span- drel is integrally formed with the arch. We do not agree with the two last tribunals, which substantially held that the descrip- tion of the invention is confined to a bridge constructed wholly of plastic material. At the time of this application these arched bridges had usually been constructed of brick or stone, although concrete was then coming more and more into use as a substitute. The method of the applicant is applicable in constructions of the three several materials, though, evidently, he had plastic materials particularly in mind. He says in his ap- plication that his invention relates to girder and arch bridges, "which are made of concrete or other suitable material." Other suitable material must be brick or stone joined with mortar. The apparent object of applicant's method is to decrease the size and thickness of the arch, thereby effecting a saving of ma- terial and labor, as well as enabling the use of less material for centering where several additional arches are to be erect- ed. This is as desirable in the use of one kind of material as in another. In another part of his specification he says: "Af-

ter completing the arch or girder, and while waiting for it to harden while striking or removing the centers, the forms of the spandrel and railing, *if to be of concrete,* may be built so that after the centers are removed from the structure the only work required to complete it is the placing of the concrete in the forms. The work may be so divided that only the railing forms of the railing and coping forms will require filling with concrete after releasing the centers." We agree with the Primary Examiner that it makes no difference in contemplating a 'method' of what material the arch is made; and we likewise think it makes no difference of what material the spandrel is made.

Without going into the question of the patentable novelty of any of the claims in view of the references to the prior art, we are of the opinion that the conclusion in respect of the six claims that were allowed warranted the allowance of all of the others. Upon that ground, and for that reason alone, we are constrained to reverse the decision as to the first nineteen claims, the allowance of which is the only question for determination. It is ordered that the decision be reversed, and this decision certified to the Commissioner of Patents as required by law.

*Reversed.*